806 F.2d 468
 55 USLW 2321, 1 U.S.P.Q.2d 1062
 KIWANIS INTERNATIONAL,
v.
RIDGEWOOD KIWANIS CLUB (D.C. Civil No. 85-4306).
KIWANIS CLUB OF RIDGEWOOD, INC., and Julie Fletcher,
v.
KIWANIS INTERNATIONAL (D.C. Civil No. 85-4483).
Appeal of KIWANIS INTERNATIONAL.
 Nos. 86-5199, 86-5278.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 16, 1986.
Decided Dec. 3, 1986.
 
 Donald E. Knebel (argued), Brian J. Martin, Barnes & Thornburg, Indianapolis, Ind., John F. Darcy, Thomas F. Cermack, Jr., Orbe, Nugent and Collins, Ridgewood, N.J., for appellant.
 Marcia K. Baer (argued), Hirsch, Newman, Simpson & Baer, Hackensack, N.J., for appellees.
 Thomas P. Ondeck, Baker and McKenzie, Washington, D.C., for amicus curiae Conference of Private Organizations.
 Before ADAMS, STAPLETON and GARTH, Circuit Judges.
 OPINION OF THE COURT
 GARTH, Circuit Judge:
 
 
 1
 Kiwanis International has appealed from a district court order holding that the local Kiwanis club of Ridgewood, New Jersey (Kiwanis Ridgewood) is a place of public accommodation within the meaning of the New Jersey statute which prohibits unlawful discrimination in places of public accommodation. The district court held that Kiwanis International could not revoke the trademark license it had granted to the local Ridgewood club, because Kiwanis Ridgewood was a "place of public accommodation" and, as such, could not refuse admission to women.[1] Moreover, the district court reformed the license agreement and permitted Kiwanis Ridgewood to continue using the Kiwanis marks under the Kiwanis charter, holding that the provisions of the Kiwanis Ridgewood license which restricted Kiwanis membership to men could be severed from the whole of the license agreement. We reverse.
 
 I.
 
 2
 Appellant Kiwanis International is the parent organization of 8,200 chartered Kiwanis clubs scattered throughout the world. Kiwanis clubs number in excess of 313,000 members. The nonprofit association, founded in 1915, is incorporated in Illinois and headquartered in Indiana. The principal focus of the Kiwanis organization is community service. Club activities include fundraisers for scholarships and other charitable purposes.[2] Kiwanis is not a secret society; members do not partake in clandestine meetings or private rituals. Neither the goals nor the activities of the organization are sex-specific. Indeed, the district court found that while a "collateral benefit" of Kiwanis membership is the pleasure of camaraderie, the social aspect of the club does not supplant its charitable and civic focus. The district court further found that Kiwanis "engages in no activities in which the presence of women would create uncomfortable or embarrassing situations." Kiwanis International v. Ridgewood Kiwanis Club, 627 F.Supp. 1381, 1384 (D.N.J.1986). Moreover, the court found, "since women already participate to such a significant degree in [Kiwanis] activities ..., their full membership will not adversely affect the camaraderie or ... impede the achievement of any of the overall goals of the organization." Id. As to the effect of any change in membership on the public, the district court found that those "persons who would otherwise contribute [to the charitable functions sponsored by Kiwanis] will not cease doing so because women are members." Id.
 
 
 3
 Chartered Kiwanis clubs are bound by the constitution and bylaws of Kiwanis International. Since its formation, Kiwanis has restricted its membership to men. This restriction is contained in article V, Sec. 4(a) of the Kiwanis constitution[3] and article II, Sec. 2 of the bylaws.[4] There are several national requirements for membership, such as employment in a recognized trade or profession. Local clubs can adopt additional requirements for membership. New members are selectively chosen. Each new member must be sponsored by at least one current member and must be accepted by vote of the local club's Board of Directors.
 
 
 4
 Kiwanis International and Kiwanis Ridgewood entered into a charter agreement on November 2, 1942. Under the agreement, Kiwanis Ridgewood was allowed to use the Kiwanis marks, as long as it adhered to the organization's constitution and bylaws. The Ridgewood club currently has twenty-eight members and meets weekly for a luncheon meeting at a local restaurant. Several individuals have been members of the Ridgewood club for over twenty years. Kiwanis Ridgewood has admitted no more than twenty members over the past decade, and every applicant has been sponsored by a member of the Kiwanis Ridgewood club.
 
 
 5
 The current dispute arose when Julie Fletcher joined the Ridgewood club in June of 1984. Following her admission to Ridgewood, Ms. Fletcher's membership application and processing fee were sent to Kiwanis International; both were promptly returned. This rejection was followed by, on June 26, 1985, a letter from the Secretary of Kiwanis International stating that Ms. Fletcher's membership was in violation of the Kiwanis constitution and bylaws and that, unless Kiwanis Ridgewood cured the violation within sixty days, Kiwanis International would revoke Ridgewood's license to use the Kiwanis marks.
 
 
 6
 Kiwanis Ridgewood refused to revoke Fletcher's membership, and Kiwanis International filed suit in federal court under the Lanham Act on September 3, 1985.[5] Kiwanis International claimed that Kiwanis Ridgewood had forfeited its license to use the marks, and sought preliminary and permanent injunctions prohibiting Ridgewood's continued use. On September 6, 1985, Kiwanis Ridgewood filed suit in New Jersey Superior Court seeking an injunction against International's license revocation and a declaration that Ms. Fletcher was a bona fide member of the Ridgewood club. Kiwanis Ridgewood asserted in its complaint that the revocation would violate the New Jersey Law Against Discrimination.
 
 
 7
 Kiwanis International removed Ridgewood's suit to federal court, where both parties agreed to a consolidation of their suits. Kiwanis International then filed a motion to dismiss Ridgewood's complaint on the grounds of failure to state a claim. The district court considered International's motion to dismiss and both parties' requests for injunctions in an evidentiary hearing on November 18 and 19, 1985.[6] The district court filed its opinion on February 6, 1986.
 
 
 8
 In its opinion, the district court examined each of the consolidated actions, and found that federal law did not preempt the application of New Jersey law as to either claim. Applying the New Jersey Law Against Discrimination, the district court held that Kiwanis Ridgewood was a place of public accommodation and as such was prohibited from restricting membership on the basis of sex. The district court then held that Kiwanis International was precluded from enforcing its illegal discriminatory membership restrictions against Ridgewood. Finding the illegal part of the charter agreement between Kiwanis International and Kiwanis Ridgewood to be severable, the district court reformed the license agreement concluding that Kiwanis International was prohibited from revoking Kiwanis Ridgewood's trademark license just because Kiwanis Ridgewood had admitted a female member.
 
 
 9
 On March 6, 1986, final judgment was entered dismissing International's trademark action; reforming the license agreement between Kiwanis International and Kiwanis Ridgewood to reflect the severance of the illegal membership provision; and permitting Kiwanis Ridgewood to continue using the Kiwanis name and service marks. Kiwanis International timely appealed. This court's jurisdiction is found under 28 U.S.C. Sec. 1291.
 
 II.
 
 10
 The purpose of a public accommodations law, such as the New Jersey statute 10:5-12(f), is to ensure that publicly offered goods and services, such as those offered by a hotel or restaurant, are available to all persons regardless of sex, race, or any other protected characteristic. The New Jersey Law Against Discrimination prohibits an operator of any place of public accommodation from denying any of its accommodations, advantages, facilities or privileges on the basis of race, creed, color, national origin, ancestry, marital status, nationality or sex. N.J.S.A. 10:5-12(f).[7] However, to be subject to the statute's proscriptions, an organization or establishment must be a "place of public accommodation." A "place of publicaccommodation" is statutorily defined in N.J.S.A. 10:5-5(l):
 
 
 11
 1. "A place of public accommodation" shall include, but not be limited to: any tavern, roadhouse, hotel, motel, trailer camp, summer camp, day camp, or resort camp, whether for entertainment of transient guests or accommodation of those seeking health, recreation or rest; any producer, manufacturer, wholesaler, distributor, retail shop, store, establishment, or concession dealing with goods or services of any kind; any restaurant, eating house, or place where food is sold for consumption on the premises; any place maintained for the sale of ice cream, ice and fruit preparations or their derivatives, soda water or confections, or where any beverages of any kind are retailed for consumption on the premises; any garage, any public conveyance operated on land or water, or in the air, any stations and terminals thereof; any bathhouse, boardwalk, or seashore accommodation; any auditorium, meeting place, or hall; any theatre, motion-picture house, music hall, roof garden, skating rink, swimming pool, amusement and recreation park, fair, bowling alley, gymnasium, shooting gallery, billiard and pool parlor, or other place of amusement; any comfort station; any dispensary, clinic or hospital; any public library; any kindergarten, primary or secondary school, trade or business school, high school, academy, college and university, or any educational institution under the supervision of the State Board of Education, or the Commissioner of Education of the State of New Jersey. Nothing herein contained shall be construed to include or to apply to any institution, bona fide club, or place of accommodation, which is in its nature distinctly private; nor shall anything herein contained apply to any educational facility operated or maintained by a bona fide religious or sectarian institution, and the right of a natural parent or one in loco parentis to direct the education and upbringing of a child under his control is hereby affirmed; nor shall anything herein contained be construed to bar any private secondary or post-secondary school from using in good faith criteria other than race, creed, color, national origin or ancestry, in the admission of students.
 
 
 12
 (Emphasis added.)
 
 
 13
 Although the parties have raised a number of issues, both statutory and constitutional, we find it necessary to address only the question as to whether the New Jersey statute against discrimination has been violated. Thus our primary task is to determine whether the Kiwanis club of Ridgewood is a "place of public accommodation" within the meaning of N.J.S.A. 10:5-5(l ). If Kiwanis Ridgewood meets the statutory requirement of being a "place of public accommodation," then of course the provision in Kiwanis International's license agreement would be illegal and therefore unenforceable because of its discriminatory character. On the other hand, if Kiwanis Ridgewood is not a "place of public accommodation" as provided in the statute, then no illegality attaches to the provision of the license agreement and the agreement is enforceable according to its terms.[8]
 
 
 14
 To determine if the New Jersey statute has been violated by the "men only" provision of the license agreement, we must look to New Jersey decisional law and, in particular, to the one case which has interpreted the statute and furnished the standard for our analysis: National Organization of Women v. Little League Baseball, 127 N.J.Super. 522, 318 A.2d 33, aff'd mem., 67 N.J. 320, 338 A.2d 198 (1974).
 
 
 15
 New Jersey addressed the status of a membership organization under the public accommodation law in Little League. The case arose because the Little League baseball program excluded girls aged 8 to 12 from participation. The Little League organization argued that because of physical differences, girls as a class were more likely to be injured playing hard ball baseball than boys. Of particular guidance to us here, however, is the additional argument made by Little League that because Little League baseball did not constitute a "place of public accommodation" within the meaning of the intent of N.J.S.A. 10:5-5(l ), there was no requirement that girls be admitted as participants in Little League baseball.[9]
 
 
 16
 Judge Conford, writing for the Superior Court of New Jersey, Appellate Division, affirmed the order of the Division of Civil Rights which found that girls would not suffer a materially greater hazard of injury playing baseball than boys of the same age group, and, more importantly from the standpoint of this case, that Little League constituted a "public accommodation" requiring nondiscriminatory participation. In so holding, Judge Conford wrote: "Little League is a public accommodation because the invitation is open to the children in the community at large, with no restriction (other than sex) whatever.... It is public in the added sense that local governmental bodies characteristically make the playing areas available to the local leagues, ordinarily without charge." Little League, 127 N.J.Super. at 531, 318 A.2d at 37-38 (citation omitted).
 
 
 17
 The New Jersey court then emphasized, as we have quoted above, that Little League is a place of public accommodation because it openly invites all children of the community, with no restriction except sex, to join. It is this standard of open invitation to all that defines the content of a "public accommodation," and establishes the essential character of those organizations which are subject to the statute's proscriptions and those that are not.
 
 
 18
 The Supreme Court of New Jersey summarily affirmed the Appellate Division. National Organization of Women v. Little League Baseball, 67 N.J. 320, 338 A.2d 198 (1974).
 
 
 19
 This analysis, dependent on selectivity, has found expression in other jurisdictions as well. In United States Jaycees v. McClure, 305 N.W.2d 764 (Minn.1981), the Minnesota Supreme Court, in construing a public accommodation statute similar to that of New Jersey, concentrated on the business character of the organization, an issue not present in the instant Kiwanis proceeding. The Minnesota legislature had directed that the term "place of public accommodation" be liberally construed to mean roughly "public business facility." In the course of its analysis of the "public" component of the statutory standard, the Minnesota court examined the "selectiveness of the group in the admission of its members, i.e., standards and a formal procedure by which membership is restricted; and ... the existence of limits on size of the membership." Id. at 770.
 
 
 20
 The court focused on the criterion of selectivity stating that the Jaycees were "unselective in those to whom it sells its memberships; selectiveness occurs only in the privileges and benefits it accords to those holding one kind of membership rather than another." Id. at 771. The court found "in fact, that the national organization encourages continuous recruitment and discourages the use of any selection criteria," noting that "[m]ost important, though, is the absence of selection criteria. This is evinced by the national organization's Officers & Directors' Guide 1977-78, which advises that the emphasis in recruitment be on quantity rather than quality." Id. The court concluded that "[b]y virtue of its unselective vigorous sale of memberships, the national organization is a public business." Id. at 771.
 
 
 21
 Thus even though the Minnesota Supreme Court's conclusion differs from the conclusion which we reach, it did so not because it differed from the Little League analysis, but rather because it emphasized the "public business facility" standard found in the Minnesota statute, and found that the Jaycees' membership practices were unselective and unrestricted. This latter holding was reached by applying the same selectivity standard to the Jaycees which Little League applied. The Minnesota court, in concluding that the Jaycees were unselective in their membership practices,[10] held that the Jaycees came within the Minnesota public accommodation statute.
 
 
 22
 We do not focus on the spatial characteristics of "place" as that term appears in the statute to the same extent as did the district court. The district court, in focusing on "place," rather than "place of public accommodation," wrote: "Because Kiwanis conducts its meetings in just such places,--i.e., public restaurants--[this] court concludes that the New Jersey Supreme Court would be as prepared to find that the statutory 'place' requirement has been met here as it was in Little League." Kiwanis International, 627 F.Supp. at 1387.
 
 
 23
 Despite the district court's emphasis on the term "place" rather than the more meaningful clause "place of public accommodation," the district court quoted with approval: "a 'place of public accommodation or a facility' is less a matter of whether the organization operates on a permanent site, and more a matter of whether the organization engages in activities in places to which an unselected public is given an open invitation." Id., citing United States Jaycees v. McClure, 305 N.W.2d 764, 773 (Minn.1981).
 
 
 24
 Our difference with the district court is that it found central to its decision the fact that Kiwanis Ridgewood conducted its meetings in public restaurants, a matter which we regard as irrelevant to the primary consideration stressed in Little League which requires that we scrutinize not where the gathering takes place but rather whether the invitation to gather is open to the public at large. Little League, 127 N.J.Super. at 531, 318 A.2d at 37-38.[11]
 
 III.
 
 25
 Thus the mere fact that Kiwanis Ridgewood meets in a public place cannot lead to the conclusion drawn by the district court that such meetings constitute Kiwanis Ridgewood as a "place of public accommodation" as Little League had defined that term. Membership organizations or clubs do not become "public accommodations," simply because they choose to meet in public restaurants.[12] As we interpret Little League, to be subject to the prohibitions of the statute, the organization or club must invite an unrestricted and unselected public to join as members.
 
 
 26
 As we have stated, our task is to determine whether Kiwanis Ridgewood is a place of public accommodation. To do so, we must review the findings of fact which bear on that determination and which were made by the district court. However, the district court did not find facts answering the question of whether Kiwanis Ridgewood solicited members from a selected or an unselected public nor did it find facts answering the question whether Kiwanis Ridgewood's invitation to membership was open to the community at large or was an invitation restricted to particular individuals. In normal course, absence of such critical findings would dictate that we remand to the district court to have such findings made. Here, however, having examined the record before us and discerning nothing in that record which could support any findings that Kiwanis Ridgewood had opened its membership rolls to the "community at large," we are satisfied that these questions answer themselves.
 
 
 27
 Accordingly, if the standard by which Kiwanis Ridgewood must be measured is the Little League standard which defines "public accommodation," the record establishes conclusively that Kiwanis Ridgewood does not fit within the statutory definition of "public accommodation." It is thus not precluded from restricting its membership to men. In such a posture, there is no need for expending limited judicial resources in remanding to the district court to make findings where we have examined the evidence and have concluded that the evidence can lead to only one result.
 
 A.
 
 28
 The evidence of Kiwanis Ridgewood's membership practices is undisputed. The Ridgewood club is small, comprised of only twenty-eight members. Ten individuals have been members for over twenty years. Indeed, Kiwanis Ridgewood has admitted no more than twenty members over the course of the past decade. Each new member had to be sponsored by a current member, and formally voted in by the Ridgewood Board of Directors. The sponsorship of the existing member acted as a primary screening mechanism in the maintenance of the quality of membership. In addition to national membership requirements, Kiwanis Ridgewood established several local membership requirements, which included, among others, the candidate's willingness to pray at meetings and to recite the pledge of allegiance.
 
 
 29
 Although Kiwanis International has encouraged large-scale membership solicitation in the past, the suggested "membership roundup" mailings were sent only to those prospects already known by current members. These individuals would be invited to a Kiwanis meeting to determine their compatability with the organization's goals and members. The scope of these membership drives was limited. Not only did every solicited individual have to be known by an existing member, but every applicant out of that group of solicited individuals would have to be sponsored by an existing member.
 
 
 30
 Interestingly, despite the "membership roundup" practice suggested by Kiwanis International, Kiwanis Ridgewood itself never attempted any such "membership roundup." It did, however, in January of 1984, mail about fifty letters to corporations in the Ridgewood area inviting each to send a representative to a Kiwanis meeting. This particular membership drive sought only to elicit interest in the club. Interested individuals were not promised membership, only an opportunity to attend a Kiwanis Ridgewood meeting. Any prospective candidate for membership still had to be sponsored by an existing member of Kiwanis Ridgewood and meet compatability and other requirements of the organization.
 
 
 31
 This evidence of membership practices and policy does not reflect an open and unrestricted invitation to the community at large to join Kiwanis Ridgewood. Rather, all the evidence points totally in the opposite direction. If the test of "place of public accommodation" is unselectivity, unrestrictedness, and open invitation, as Little League informs us that it is, it is evident Kiwanis Ridgewood's practices do not pass that test.[13]
 
 B.
 
 32
 Kiwanis International also argued that the statute which defines "place of public accommodation" also explicitly provides that: "Nothing herein contained shall be construed to include or to apply to any institution, bona fide club, or place of accommodation, which is in its nature distinctly private." N.J.S.A. 10:5-5(l ). Kiwanis International contended that it is a club which in its nature is distinctly private. The district court concluded otherwise. It did so, not by focusing on the effect of Kiwanis Ridgewood's membership practices as they impacted upon the communities surrounding Ridgewood, but rather by examining the Kiwanis International complex (i.e., 8,200 clubs, 313,000 members) as a whole, subjecting that analysis not to the New Jersey statutory standard but to a constitutional standard involving freedom of association.[14]
 
 
 33
 We do not read N.J.S.A. 10:5-5(l ) as the district court did. In our view, the latter part of the statute which excludes bona fide clubs which are distinctly private from the "places of public accommodation," represents the other side of the "public accommodation" coin. This is particularly so because of the emphasis placed on "selectivity" as the standard for determining "public accommodation," as well as for determining if a club is "distinctly private." If a club is "bona fide," as no one contends Kiwanis Ridgewood is not, and if it is not a "place of public accommodation" because of its selective membership practices, it must be private as that term is used in the statute. See Brown v. Loudoun Golf & Country Club, 573 F.Supp. 399, 403 (E.D.Va.1983) ("The key factor is whether the club's membership is truly selective."); United States v. Trustees of Fraternal Order of Eagles, 472 F.Supp. 1174, 1175 (E.D.Wis.1979) ("... the most important factor in determining whether a club is in fact private is the process which the club actually uses in selecting its members"); Kiwanis Club of Great Neck, Inc. v. Bd. of Trustees of Kiwanis, 41 N.Y.2d 1034, 363 N.E.2d 1378, 395 N.Y.S.2d 633 (1977), aff'g 52 A.D.2d 906, 383 N.Y.S.2d 383 (1976), aff'g 83 Misc.2d 1075, 374 N.Y.S.2d 265 (1975), cert. denied, 434 U.S. 859, 98 S.Ct. 183, 54 L.Ed.2d 132 (1977).
 
 
 34
 We derive that learning from Little League which, while not discussing this aspect of the statute itself, nevertheless requires us to draw that implication from its overall discussion of "place of public accommodation." We do not believe that a freedom of association constitutional analysis of Kiwanis International's overall operation and structure--an analysis which the district court performed--is helpful in deciding whether a discrete component of Kiwanis International (i.e., Kiwanis Ridgewood) falls within or without the New Jersey statutory definition of "place of public accommodation." Our decision in that regard must be controlled by the New Jersey court's construction of its own legislation. See National Surety Corp. v. Midland Bank, 551 F.2d 21 (3d Cir.1977).
 
 
 35
 Thus, our reading of the instant record in light of the interpretation of the New Jersey statute as glossed by Little League leads inexorably to the conclusion that Kiwanis Ridgewood, having a selective, nonpublic membership policy, is not a "place of public accommodation" but is rather in its nature distinctly private. It therefore falls without the prohibitions of the New Jersey Law Against Discrimination.
 
 IV.
 
 36
 Having concluded that Kiwanis Ridgewood does not constitute a place of public accommodation, there is no need for us to address all of the subsidiary arguments raised by the parties.[15] One argument, however, deserves brief mention.
 
 
 37
 Kiwanis Ridgewood has consistently asserted that Kiwanis International's appeal is moot because the Board of Trustees of Kiwanis International has recently changed its position and now supports the admission of women into the organization. The facts belie this contention. Kiwanis Ridgewood, looking only to the actions of the Board of Trustees of Kiwanis International, claims that the Board has now reversed its position and now permits women as members. Therefore, Kiwanis Ridgewood claims, the entire issue before this court is moot.
 
 
 38
 However, our attention is called to the fact that in order to change the constitution and bylaws, a two-thirds majority must vote to do so at the Kiwanis International annual convention. We recognize that although the Board may have reversed its position on women members, the Kiwanis membership at the June 1986 meeting did not follow suit. Rather, the membership voted down a proposed amendment to the constitution which would allow women to become members of Kiwanis.
 
 
 39
 There has thus been no change in the provisions of the original constitution and bylaws which would permit any Kiwanis club to admit other than male members. This constitution and bylaws are binding upon Kiwanis Ridgewood absent authorized modifications. Because no modification which would permit the admission of women as members has been voted, we reject Kiwanis Ridgewood's argument that this appeal is moot.
 
 V.
 
 40
 In concluding that the provision of the Kiwanis Ridgewood license agreement did not violate the New Jersey Law Against Discrimination, we find no need to address the severability issue which assumed importance at the trial level only because of the district court's determination that the "men only" provision of the license agreement was illegal. As appears above, we have held otherwise. We therefore conclude that the license agreement in its original form is to be enforced in accordance with its terms.
 
 
 41
 In so holding we do not condone the restrictive practices of Kiwanis International any more than the district court did. We share the district court's perturbation that an organization with a membership as large as Kiwanis and with objectives of such worthwhile value should nevertheless exclude from its membership qualified individuals only because they are not of the male sex.
 
 
 42
 The issues before us, however, do not permit our personal predilections to control our decision. We are faced not with a question of how we personally would respond to such an issue but whether Kiwanis International has responded to this problem illegally. We are satisfied that, in its enforcement of its license agreement with Ridgewood, Kiwanis International did not violate New Jersey's laws. That is the only issue which is properly before us and the only issue that we may appropriately answer.
 
 VI.
 
 43
 We will reverse the March 6, 1986 judgment of the district court and remand with directions to the district court that it vacate its order of March 6th and enter a new and different judgment in favor of Kiwanis International which will permit enforcement of its license agreement according to its original terms.
 
 
 44
 ADAMS, Circuit Judge, concurring.
 
 
 45
 Although I concur in the result reached by the majority, I write separately to emphasize my conviction that the facts of this case make the issue a closer one than the majority appears willing to concede. Thus, while I am persuaded that the Kiwanis Club of Ridgewood, and its parent organization, Kiwanis International, are "distinctly private" within the meaning of the New Jersey Law Against Discrimination, I reach this conclusion only after weighing several factors that, under the analysis of the New Jersey courts in N.O.W. v. Little League, make this issue a close as well as a complex question.
 
 
 46
 Among the factors that tend to undermine a claim that Kiwanis is distinctly private are: (1) the size of the club's membership, which includes some 8,200 local chapters and 313,000 individual members, Kiwanis International, 627 F.Supp. at 1383; (2) the turnover brought about by the high rate of attrition among first-year Kiwanis members, which generally ranges from 60% to 70% annually, id.; (3) the fact that Kiwanis solicits members through large-scale "membership round-ups," app. at 412; and (4) the fact that employers often pay the dues of employee members, app. at 146. Although some of these characteristics apply to the national Kiwanis organization, as contrasted with the local chapter, I do not believe that this is a significant point when the question at issue here is viewed in context. I am persuaded, therefore, that each of these aspects of the Kiwanis organization argues against the claim that Kiwanis uses strict selection criteria for screening members, and should be weighed against the countervailing factors discussed in the majority opinion.
 
 
 47
 Even acknowledging the existence of such nonprivate components of Kiwanis, however, I am persuaded that the New Jersey Law Against Discrimination does not control here, and that Kiwanis International may require the local club at Ridgewood to comply with the discriminatory Kiwanis constitution and bylaws. As the majority correctly points out, Kiwanis does maintain some selectivity in determining whom to admit as members, and it is this selectivity that distinguishes Kiwanis from the Little League. All Kiwanis members must belong to a trade or profession, subscribe to the charitable goals of the club, and be sponsored by a club member.
 
 
 48
 Unlike the athletic organization involved in Little League, the public at large is not invited to join Kiwanis. Meetings of Kiwanis clubs generally are held in restaurants, rather than in public parks or playgrounds in full view of passers-by as in Little League. Further, the requirement that any new member be sponsored by an existing member reinforces the selectivity of Kiwanis membership. The Little League decision, which stressed the facts that the Little League organization imposed no other selection criterion than that of sex and that its activities were conducted in full view of the general public, supports the conclusion that the degree of selectivity present here is sufficient to remove a club from the purview of the Law Against Discrimination.
 
 
 49
 Consequently, I join the result reached by the majority, but believe that the focus of the majority unfortunately avoids consideration of factors that should be weighed in the analysis of whether Kiwanis clubs fall within the ambit of the public accommodation law. Given that the statute itself does not define the term "distinctly private," the New Jersey legislature is, of course, free to amend the statute in order to reach groups such as Kiwanis and similar organizations.
 
 
 
 [1]
 The Kiwanis license permitted Ridgewood to use the Kiwanis name and logos consisting of four service marks all of which are related to the "Kiwanis" name. The district court found that:
 The marks are used by local clubs primarily to promote their services activities, and are also used to attract new members and to identify the locals to members of other Kiwanis clubs. The use of the service marks is central to the success of the locals' service and fund raising activities--indeed, to the locals' continued existence--because those marks inspire public confidence in the activities being promoted.
 Kiwanis International v. Ridgewood Kiwanis Club, 627 F.Supp. 1381, 1384 (D.N.J.1986).
 
 
 [2]
 The objectives of the Kiwanis organization are presented in its constitution. Article II reads:
 To give primacy to the human and spiritual, rather than to the material values of life.
 To encourage the daily living of the Golden Rule in all human relationships.
 To promote the adoption and the application of higher social, business, and professional standards.
 To develop, by precept and example, a more intelligent, aggressive, and serviceable citizenship.
 To provide, through Kiwanis clubs, a practical means to form enduring friendships, to render altruistic service, and to build better communities.
 To cooperate in creating and maintaining that sound public opinion and high idealism which make possible the increase of righteousness, justice, patriotism, and good will.
 
 
 [3]
 Article V, Sec. 4(a) of the Kiwanis constitution reads: "The active membership of this club shall consist of men of good character and community standing residing or having other community interests in the area of this club."
 
 
 [4]
 Article II, Sec. 2 of the Kiwanis bylaws reads: "Membership in a chartered club is limited to males over eighteen years of age who satisfy the qualifications for either active membership, privileged membership, senior membership, or honorary membership...."
 
 
 [5]
 Our analysis and disposition do not require us to address Kiwanis International's arguments regarding Lanham Act violations
 
 
 [6]
 Both International and Ridgewood agreed that the trial of this action on the merits be advanced and consolidated with a hearing of their requests for injunctions
 
 
 [7]
 It shall be unlawful discrimination "[f]or any owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodation directly or indirectly to refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof, or to discriminate against any person in the furnishing thereof ... on account of the race, creed, color, national origin, ancestry, marital status, sex or nationality of such person ...." N.J.S.A. 10:5-12(f)
 
 
 [8]
 A trademark licensing agreement is a contract to be interpreted and enforced under state law. Judge Adams, writing for the court in Mariniello v. Shell Oil Co., 511 F.2d 853 (3d Cir.1975), stated that the "[i]nvalidation of contract clauses held repugnant to state public policy is a proper exercise of the state judicial function." Id. at 858. The Mariniello court went on to conclude that "once the state court has declared a clause invalid as violating the public policy of the state, a federal court may not enforce such a term solely because a contract entails the licensing of a federally protected trademark." Id
 It is thus clear that in the event a licensing agreement clause is held to be illegal, it cannot be enforced. Conversely, if no state policy is violated, then the agreement must be given full effect. To the extent that Kiwanis International argues otherwise, that argument is rejected.
 
 
 [9]
 Among other arguments, Little League contended that it was not a public accommodation because it was a membership organization which did not operate from any fixed parcel of real estate in New Jersey of which it had exclusive possession by ownership or lease. The New Jersey court responded that "[t]he statutory noun 'place' (of public accommodation) is a term of convenience, not of limitation." Little League, 127 N.J.Super. at 531, 318 A.2d at 37, but that in any event Little League fulfilled the statutory spatiality requirement, i.e., "place," because the "places" of public accommodation were the ball fields where tryouts, practices, and games were held
 
 
 [10]
 Because the issues in United States Jaycees v. McClure, 305 N.W.2d 764 (Minn.1981), had been certified to the Minnesota Supreme Court by the United States District Court for the District of Minnesota, the proceedings were reviewed by the United States Supreme Court where the Jaycees pressed their constitutional issue. Roberts v. United States Jaycees, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). The Supreme Court held that the application of the Minnesota public accommodations statute did not violate the male members' freedom of expressive or intimate association. Because of our holding, we do not reach the constitutional issues decided in Roberts
 
 
 [11]
 In other jurisdictions, courts interpreting "place of public accommodation" have centered their analysis on "place" rather than "public accommodation." The cases generally hold that where the organization maintained no physical "place" of operations in the state (as Kiwanis Ridgewood did not in New Jersey) and did not resemble any of the various types of physical facilities enumerated in the examples found in the particular state statute, the organization did not constitute a "place of public accommodation." See, e.g., United States Jaycees v. Richardet, 666 P.2d 1008 (Alaska 1983) (not place of public accommodation); United States Jaycees v. Bloomfield, 434 A.2d 1379 (D.C.1981) (organization not a place of public accommodation because did not operate from any particular place); United States Jaycees v. Mass. Comm'n. Against Discr., 391 Mass. 594, 463 N.E.2d 1151 (1984) (not a place of public accommodation where it did not maintain a place of business in Mass. and did not resemble examples of "places" listed in statute)
 
 
 [12]
 The restaurant itself, because it invites attendance by the general public, would be a "place of public accommodation" within the meaning of the statute
 
 
 [13]
 Rotary Club of Duarte v. Board of Directors, 178 Cal.App.3d 1035, 224 Cal.Rptr. 213 (1986), cert. granted, --- U.S. ----, 107 S.Ct. 396, 93 L.Ed.2d 350, and Roberts v. United States Jaycees, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) are not to the contrary. In light of our discussion, we do not reach the constitutional issues which concerned the Court in Roberts nor are we bound by the California court's interpretation of their civil rights law in Duarte. The district court, because it read the statute and Little League differently than we have, was obliged to consider Kiwanis International's constitutional claim. We are not
 
 
 [14]
 Judge Adams, in his concurring opinion, agrees that the hallmark of the "distinctly private" club is its selectivity in determining whom to admit as members, and that because of the evidence of Kiwanis Ridgewood's high degree of selectivity, the New Jersey Law Against Discrimination cannot apply to Kiwanis Ridgewood. He writes in concurrence, however, because he is concerned that some aspects of the record were not weighed as heavily as others in determining selectivity
 Without taking issue with Judge Adams' concerns or with his enumeration of the factors he lists, it bears mention that the record just does not disclose the rate of attrition of Kiwanis Ridgewood members or the fact that Kiwanis Ridgewood advertises in business or trade publications for members. Inasmuch as our focus must necessarily be on Kiwanis Ridgewood, a club with but 28 members, it is apparent that evidence dealing with the whole of the Kiwanis International complex is irrelevant in determining whether Kiwanis Ridgewood is a place of public accommodation within the purview of the New Jersey Law Against Discrimination.
 
 
 [15]
 The appellant, Kiwanis International, presented the following arguments. First, it argued that the Lanham Act preempted the application of state law which would compel International to license its marks to a club not sharing its uniform membership criteria. Kiwanis International argued in the alternative that it is not a public accommodation, but rather a "distinctly private" club. As a second alternative, International argued that, if the provision were illegal, it would not be severable from the whole of the agreement. Briefly, the appellee Ridgewood argued that the Lanham Act did not preempt state law, that the Kiwanis members' right to freedom of association was not infringed by the application of the statute, that the Ridgewood club was a public accommodation, and, finally, that the illegal provision was severable